In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 16-3996

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JEFFREY ROTHBARD,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:14-cr-00089-RLY-DML — **Richard L. Young**, *Judge.*

———————————

ARGUED FEBRUARY 17, 2017 — DECIDED MARCH 17, 2017

———————————

Before WOOD, *Chief Judge,* and BAUER and POSNER, *Circuit Judges.*

WOOD, *Chief Judge.* Jeffrey Rothbard pleaded guilty to one count of wire fraud in connection with his participation in a scheme to defraud companies that were interested in obtaining loans for environmentally friendly upgrades to their facilities. He committed this offense, which yielded more than $200,000 for him, while he was on probation for a felony forgery conviction in Indiana. The district court sentenced him

to 24 months' imprisonment, despite the fact that Rothbard is an older man with serious health problems and the Probation Office thought that incarceration was not necessary. On appeal, Rothbard urges us to find that his sentence is substantively unreasonable, both because he has stayed out of trouble for nearly three years and because he fears that the Bureau of Prisons (BOP) may be unable to furnish the medication on which his health critically depends.

Perhaps, had we been the sentencing judges, we would have accepted his arguments. But the district court here gave sound reasons for its chosen sentence. In addition, both the evidence in the record before the district court, and supplemental information that we requested about BOP's ability to provide appropriate care, satisfy us that the nominal 24-month sentence will not, in reality, spell doom for Rothbard. We therefore affirm the district court's judgment.

# I

Rothbard's offenses date back to at least 2010, when he installed some check designer programs on an office computer and used them to forge two checks, amounting to $7,700, to his wife. He was convicted in state court for that offense and placed on probation. While on probation, he launched the scheme that underlies his present conviction. When all was said and done, he had defrauded 17 victims of $211,658.53, acting as the registered agent of "GreenCity Finance." The scheme was relatively simple: GreenCity would purport to arrange for financing for energy savings upgrades, but it would require a deposit to process the loan. The clients paid the deposits, but the money went straight to Rothbard's pocket. He used it on personal items, including to attend a PGA golf tournament and to buy his son a vehicle. Ultimately he was caught

and charged with wire fraud in violation of 18 U.S.C. § 1343; he waived indictment and pleaded guilty. His appeal pertains exclusively to his sentence.

## II

The key fact behind Rothbard's sentencing challenge relates to his health. In 2005, well before the time he instituted the GreenCity scheme, he was diagnosed with imatinib-resistent chronic myeloid leukemia—a particularly virulent form of that cancer. His doctor, Larry Cripe, prescribed the drug nilotinib, which is one of three possible drugs recognized for the treatment of Rothbard's type of leukemia. All three are extremely expensive: the Journal of Clinical Oncology reported in 2013 that the annual price of nilotinib is $115,000 to $124,000; the price of the other two drugs, dasatinib and ponatinib, appears to be comparable. Hagop M. Kantarjian *et al.*, *Cancer Drugs in the United States:* Justum Pretium – *The Just Price*, 31 J. Clinical Oncology 3600, 3601 (2013).

Before sentencing, the Probation office prepared its usual Presentence Investigation Report (PSR), in which it calculated an adjusted offense level of 16 and a criminal history of II, which translates into a range of 24 to 30 months' imprisonment. Because of Rothbard's health, however, Probation recommended a more lenient sentence: 12 months' detention at a halfway house and another 12 months' home confinement, in lieu of prison. It suggested that this would offer adequate deterrence and would assure that Rothbard's medical needs were properly met. Probation then revised the recommendation to three years' probation, noting that although Rothbard seemed to need a harsher penalty to deter future criminal be-

havior (because he had committed the fraud while on probation), it seemed unfair to burden the taxpayers with the exorbitant cost of Rothbard's medication in prison.

Rothbard filed a pre-sentencing memorandum in which he urged that a custodial sentence would be unreasonable, because (he asserted) BOP could not *guarantee* that he would receive the medical care he needed in one of its facilities. The reason for the lack of a guarantee relates to the way in which BOP manages prescription drugs. It maintains a formulary of drugs that its physicians are permitted to prescribe without further ado. That does not mean, however, that non-formulary drugs are impossible to obtain. To the contrary, if a doctor believes that a patient needs a non-formulary drug, the doctor may prescribe it by following certain procedures.

Based primarily on the nature of Rothbard's crime and the fact that he committed it while on probation, the district court rejected Probation's recommendations and imposed a Guidelines sentence of 24 months in the custody of BOP, followed by two years' supervised release. In so doing, it did not ignore Rothbard's medical situation. It took into account a letter that the government had obtained from Dr. Paul Harvey, the Regional Medical Director for BOP's North Central Region. Dr. Harvey reviewed Rothbard's records and a letter from Dr. Cripe, and offered these comments:

> CARE Level 4 inmates require services available at a Medical Referral Center (MRC) and may require daily nursing care. The MRC facilities have clinical staff available in-house, 24-hours per day, and have contracts with community specialists for additional review and/or care, if clinically necessary. The BOP has

six Medical Referral Centers [including] Butner, North
Carolina.

Rothbard was later designated to Butner, although it appears
that he will need a re-designation after this appeal is resolved.

Dr. Harvey's answer to the question whether Rothbard
would be able to continue with his successful course of ni-
lotinib was a qualified "yes." He conceded that nilotinib is not
on the National Drug Formulary, but he said that BOP permits
a medical provider to "submit a non-Formulary request and
prescribe the requested medication pending approval of the
request." He also noted that an expedited approval process
exists, and when it is used, a decision on the request is gener-
ally made within 24 hours. (The need for such approval is the
reason we describe the "yes" as qualified.) Finally, Dr. Harvey
said that nilotinib had been "approved for inmates with med-
ical conditions similar to Mr. Rothbard's."

The district court considered Rothbard's leukemia as it
considered what sentence to impose, but it was unpersuaded
that Rothbard's medical condition justified a noncustodial
sentence. It relied on Dr. Harvey's representation that BOP
could provide whatever care was necessary. Turning to the
other side of the balance, it noted several facts that pointed
toward a sentence including imprisonment. Calling Roth-
bard's scheme a "crime of pure greed," the court referred to
the need to protect the public and the fact that Rothbard had
brazenly committed this crime while on probation for the for-
gery offense. The judge commented that the crime was suffi-
ciently troublesome, in his view, that he "never really seri-
ously considered probation." Instead, he opted to accommo-
date Rothbard's medical needs by "point[ing] out to the Bu-
reau of Prisons that the defendant does have leukemia that's

in remission by medication and request[ing] that the Bureau of Prisons take special note of that medication and make sure that he receives that medication for treatment of that condition so that it remains in remission."

Because of the grave nature of his medical condition and the risk that a deprivation of nilotinib might cause a serious recurrence of his disease, Rothbard moved for a stay of his report date pending his appeal in this court. The district court denied the stay, but this court granted it and expedited the appeal. In addition, because we were unsure how effectively the procedures described by Dr. Harvey operate, we ordered the parties to provide additional information about what Rothbard might expect if he were to go to a BOP facility. It is unusual, we concede, to supplement the record on appeal on such a critical point, but the stakes are high, and so we thought this step was justified.

When a new inmate shows up at BOP, the inmate goes through a comprehensive medication review as part of his intake screening. For purposes of continuity of care, the government represents, BOP policy allows for the continuation of most medications—including non-formulary drugs—for a period of time pending review and approval of anything that is not on the Formulary. Rothbard appears to agree with that, in part. He presents an updated affidavit from Philip Wise, the former Assistant Director of BOP with responsibility for health care. (This too is new on appeal; we grant Rothbard's February 8, 2017, motion to supplement the record with Wise's Declaration.) Wise states that non-formulary drugs may be continued for four days upon arrival. After that, according to Wise, there are no guarantees. Relying on this,

Rothbard argues that this means for him that there is no assurance that he will be able to continue with his nilotinib after the four-day period expires. The government responds that Wise himself concedes that BOP has the ability to process urgent requests within hours, if medically necessary. It also reports that there have been ten requests for nilotinib since 2010, and all ten requests have been approved for the same condition as Rothbard has.

We were also interested in the qualifications of the people who are responsible for these approvals. The government informs us that approval authority resides with a Central Office Physician, and that the final decision over non-formulary drug requests is made by either a pharmacist or a physician. Wise wrote that when he was in charge, denials were based on one of two possible reasons: either the requested drug was not medically necessary, or that there was a therapeutic equivalent medication available on the formulary. In this case, the government does not argue that either of those reasons would apply.

One might worry that BOP would have an incentive to be sparing with its orders for particularly expensive non-formulary drugs, such as nilotinib. There is no evidence, however, that it has done so, and in Rothbard's case, there is less reason to fear a secret economic motive. Rothbard's health care is already being billed to the public, because he is using government-provided health insurance. More importantly, the record shows that BOP has ordered nilotinib itself on ten other occasions, evidently in recognition of the fact that it might be essential (as it apparently is for Rothbard). Indeed, the high price of nilotinib suggests that it has no adequate substitutes: whether it is being used for prisoners or the public at large, a

drug that faces several therapeutic alternatives in the market
will not command as high a price.

In the final analysis, this case boils down to the fact that
BOP is not willing or able to pre-commit to nilotinib for Roth-
bard, before he has gone through the intake examination at
the prison medical center. Although it might be sensible in
cases such as this one for BOP to have some way of examining
people before they report, that is not its practice and we are
not persuaded that the lack of a pre-report examination is in-
dependently actionable. In addition, we cannot find fault with
BOP's reservation of the right to conduct its own medical ex-
amination. While Rothbard's case might be an easy one, there
will be other entering inmates who are subjectively convinced
that they need one particular medication, but for whom an
alternative or more conservative treatment may be medically
acceptable. BOP would be acting irresponsibly if it did not
make an independent decision, based on a thorough and pro-
fessional examination of the new inmate and his medical his-
tory.

### III

We conclude that this is not a case in which the only sub-
stantively reasonable sentence would have been one that kept
Rothbard out of prison. The district court was faced with evi-
dence supporting a noncustodial punishment—Rothbard's
trouble-free record for the last several years, and the assur-
ance of continuity of his successful treatment at the hands of
Dr. Cripe—as well as evidence supporting some time in
prison—the nature of his crime, the fact that he committed it
while on probation, and the factual finding that BOP would
be able to serve his medical needs. We find no clear error in
any of those findings of fact. And with this much established,

we have no reason to find Rothbard's sentence of 24 months (which fell within the recommended Guidelines range) substantively unreasonable.

We close, however, with a caveat. If Rothbard shows up at a BOP facility and discovers that the responsible people are dragging their feet in a way that deprives him for any significant time of his nilotinib, or if the BOP evaluator (contrary to all of the evidence we have seen) takes the position that a medically suitable alternative from the formulary exists, Rothbard is free to use the BOP's grievance procedures to complain about any such problem. On that understanding, we AFFIRM the judgment of the district court.

POSNER, *Circuit Judge*, dissenting. The defendant pleaded guilty to wire fraud in violation of 18 U.S.C. § 1343. The district judge sentenced him to 24 months in federal prison and also ordered him to pay restitution to the victims of the fraud—but that aspect of the sentence is not involved in his appeal. Because of the defendant's very poor health—he suffers from a rare form of leukemia (called imatinib-resistant chronic myelogenous leukemia), compounded by bipolar disorder with manic episodes, chronic arthritis, hypertension, and asthma—the probation service had recommended that the judge impose in lieu of a prison sentence a sentence of 3 years' probation, including 12 months of home confinement and 12 months of confinement in a halfway house, because it would be easier to provide for his medical needs in such locations. He is not violent; he was on pretrial release for two and a half years after his arrest and committed no crimes during that period.

In appealing the judge's sentence he argues that the Bureau of Prisons can't guarantee that he will receive adequate medical attention in a prison. He is right. The drug that he's been receiving for his leukemia is called nilotinib (trade name Tasigna). It is very expensive—more than $100,000 for a year of treatment. Perhaps because of its cost, it is not currently listed on the National Drug Formulary of the Bureau of Prisons. (A drug formulary is a list of prescription drugs that is used by practitioners to identify drugs that offer the greatest overall value.) The Bureau has sometimes provided nilotinib for prisoners suffering from ailments such as the kind of leukemia that the defendant suffers from, but it has refused to commit to providing it to this defendant. A letter sent by a doctor employed by the

Bureau to one of the prosecutors in the case states that "while nilotinib is not included in the National Formulary, this medication has been approved for inmates with medical conditions similar to Mr. Rothbard's." But how similar the other inmates' conditions are to Rothbard's—whether for example they require as frequent dosages of nilotinib as he does—is nowhere indicated. In addition the Bureau has refused to allow the defendant's need for the drug to be determined by a medical examination prior to his imprisonment, even though the results of such an examination might both vindicate the probation service's recommendation for nonprison confinement and resolve the question of his need to continue taking nilotinib.

The defendant's bipolar disorder with manic episodes (bipolar disorder used to be called manic depression) should also be examined before he's imprisoned, because it's a disorder that might be difficult to treat effectively in a prison without placing the defendant in a cell by himself (perhaps even solitary confinement), as manic episodes might upset and alarm cellmates and even prison staff, though it is now believed that solitary confinement is detrimental to a prisoner's mental health. See, e.g., *PBS Frontline*, "What Does Solitary Confinement Do To Your Mind?," www.pbs.org/ wgbh/frontline/article/what-does-solitary-confinement-do-to-your-mind/ (visited March 17, 2017, as were the other websites cited in this opinion).

Essentially the prosecution, the district court, and now my colleagues, ask that the Bureau of Prisons be trusted to give the defendant, in a federal prison, the medical treatment that he needs for his ailments. Yet it is apparent from the extensive literature on the medical staff and

procedures of the Bureau of Prisons (a literature ignored by my colleagues) that the Bureau cannot be trusted to provide adequate care to the defendant. The defendant's expert, Phillip Wise, who has extensive experience with the medical care provided to federal prisoners—he has served as the Assistant Director of the Federal Bureau of Prisons, with responsibility for health care, as the Warden of the Federal Medical Center (a Bureau of Prisons facility) in Rochester, Minnesota, and as the vice president of a company that provides medical care to federal prisoners—tells us "there is no assurance that nilotinib will, in fact, be provided for Mr. Rothbard," and the fact "that nilotinib has been approved for some inmates in the past is not an assurance that it will be provided for Mr. Rothbard without some delay as the request is evaluated or some other medication is tried first." Wise also points to "the very real difficulty the BOP has in recruiting and maintaining medical staff for its facilities," which he says "may lead to delays in care as well as provision of essential medical care by lower level medical staff."

A national survey of inmates in federal, state, and local prisons found that "among inmates with a persistent medical problem, 13.9% of federal inmates, 20.1% of state inmates, and 68.4% of local jail inmates had received no medical examination since incarceration. More than [20 percent of] inmates were taking a prescription medication … when they entered prison or jail; of these, 7232 federal inmates (26.3%), 80,971 state inmates (28.9%), and 58,991 local jail inmates (41.8%) stopped the medication following incarceration. Prior to incarceration slightly more than [14 percent of] inmates were taking a prescription medication for an active medical problem routinely requiring

medication … . Of these, 20.9% of federal inmates, 24.3% of state inmates, and 36.5% of local jail inmates stopped the medication following incarceration. Andrew P. Wilper, *et al.*, "The Health and Health Care of US Prisoners: Results of a Nationwide Survey," 99 *Am. J. Public Health* 666, 669 (2009), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2661478/. The authors conclude that "many inmates with a serious chronic physical illness fail to receive care while incarcerated." *Id.* at 666.

These problems have been documented by federal agencies. A 2016 report by the Justice Department's Office of the Inspector General on the BOP's medical staffing concluded—echoing Wise's concerns—that "recruitment of medical professionals is one of the BOP's greatest challenges and staffing shortages limit inmate access to medical care, result in an increased need to send inmates outside the institution for medical care, and contribute to increases in medical costs," and that "recruitment and retention of medical professionals is a serious challenge for the BOP, in large part because the BOP competes with private employers that offer higher pay and benefits. We further found that the BOP has not proactively identified and addressed its medical recruiting challenges in a systemic way. Rather, it has attempted in an uncoordinated fashion to react to local factors influencing medical recruiting at individual institutions." Office of the Inspector General, U.S. Department of Justice, "Review of the Federal Bureau of Prisons' Medical Staffing Challenges," pp. i–ii, March 2016, https://oig.justice.gov/reports/2016/e1602.pdf.

A 2008 report by the same office on medical care in the BOP concluded that "each of the BOP institutions we tested

did not always provide recommended preventive health
care to inmates. Our audit found that for almost half of the
preventive health services we tested, more than 10 percent of
the sampled inmates did not receive the medical service. …
The BOP (1) did not develop agency-wide guidance to
correct apparent systemic problems found during medical-
related internal reviews and external audits; (2) did not
provide health care providers with current authorization to
practice medicine on BOP inmates through privileges,
practice agreements, or protocols; (3) had not performed
required initial and renewal peer reviews for providers; and
(4) had not implemented an effective performance
measurement system related to the provision of health care
at BOP institutions." Office of the Inspector General, U.S.
Department of Justice, "The Federal Bureau of Prisons'
Efforts to Manage Inmate Health Care," p. iii, Feb. 2008,
https://www.oig.justice.gov/reports/BOP/a0808/final.pdf.

These are long-standing problems. A GAO report on
health care in the BOP, published in 1994, concluded that
"inmates with special needs, including women, psychiatric
patients, and patients with chronic illnesses, were not
receiving all of the health care they needed at the three
medical referral centers we visited. This situation was
occurring because there were insufficient numbers of
physician and nursing staff to perform required clinical and
other related tasks. ... As a result, some patients' conditions
were not improving and others were at risk of serious
deterioration." U.S. General Accounting Office, "Bureau of
Prisons Health Care: Inmates' Access to Health Care is
Limited by Lack of Clinical Staff," p. 2, Feb. 1994, www.gao.
gov/assets/220/219296.pdf.

The problems of BOP health care may soon become even more serious, given the decision by the new Attorney General, Jeff Sessions, to continue confining some federal prisoners in privately owned prisons. See Eric Tucker, "U.S. will continue use of privately run prisons, Attorney General says," Feb. 23, 2017, *PBS Newshour*, *The Rundown*, www. pbs.org/newshour/rundown/u-s-will-continue-use-privately-run-prisons-attorney-general-says/. The bad reputation of those prisons had caused the previous Administration to begin phasing out confinement of federal prisoners in them. See Memorandum from Sally Q. Yates, Deputy Attorney General, to the Acting Director, Federal Bureau of Prisons (Aug. 18, 2016), www.justice.gov/archives/opa/file/886311/download; Office of the Inspector General, U.S. Department of Justice, "Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons," Aug. 2016, https://oig.justice.gov/reports/2016/e1606.pdf.

I am mindful that if Rothbard is denied nilotinib in prison he can invoke the BOP's grievance process. But how long will that take? We're not told, and Dr. Cripe, Rothbard's physician, warns that any "prolonged interruption" in Rothbard's access to nilotinib will endanger his health.

To conclude, my inclination would be to reverse the judgment of the district court with directions to impose the sentence recommended by the probation service. But I would be content to reverse and remand with instructions that the district judge appoint neutral expert witnesses drawn both from the medical profession and from academic analysis of prison practices and conditions, with particular emphasis on the federal prison system, and that the judge

reconsider his sentence in light of evidence presented by these witnesses as well as any witnesses that the government or the defendant may care to call.

What is clear is that Jeffrey Rothbard is entitled to a more informed and compassionate judicial response to his physical and mental illnesses than he has received from the district court and this court.